MIDLAND HOTEL CORPORATION, Appellee and Cross-Appellant, v. THE REUBEN H. DONNELLEY CORPORATION, Appellant and Cross-Appellee.

*Opinion filed October 5, 1987.—Rehearing denied December 1, 1987.*

CUNNINGHAM, J., took no part.

Byron L. Gregory, Steven H. Hoeft and Richard L. Sandler, of Chicago (McDermott, Will & Emery, of counsel), for appellant and cross-appellee.

Barbara B. Hirsch, of Chicago, for appellee and cross-appellant.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Midland Hotel Corporation, brought suit in the circuit court of Cook County against defendant, The Reuben H. Donnelley Corporation, seeking lost profits arising from the breach of an oral contract to include plaintiff in the first issue of a newly published telephone directory. Following a jury trial, the plaintiff was awarded damages of $500,000. Defendant appealed and the appellate court affirmed as to liability but remanded on the issue of damages, finding that a jury instruction, tendered by the defendant as to damages, was improperly refused. (149 Ill. App. 3d 53.) Appeal is taken to this court pursuant to Rule 315. 107 Ill. 2d R. 315.

The plaintiff raises a number of issues on appeal which from our review of the record we find to be without merit; it is therefore necessary to consider only the following issues: (1) whether there was an enforceable contract to list the plaintiff under the "Hotels" heading in the new directory; (2) whether plaintiff's proof of lost profits was speculative; and (3) whether the trial court properly refused a jury instruction that lost profits must

have been within the reasonable contemplation of the defendant when the contract was formed.

The defendant publishes telephone directories which list telephone numbers and display advertisements of businesses under descriptive headings. In July of 1981, defendant issued its first Chicago Visitors Guide and Downtown Directory (the Guide). The 1981 edition of the Guide ran until July of 1982, when a new edition was released. The Guide was intended to serve as a reference material for tourists and business travelers as well as a directory for downtown businesses. It was divided into two sections, the first section contained numerous maps and photos of points of interest in the city of Chicago while the second section consisted of an ordinary Yellow Pages directory for the downtown area. All downtown businesses were to receive one free regular listing in the Yellow Pages section of the Guide. Defendant earned revenue by selling bold-faced listings and display advertisements with rates proportional to the breadth of distribution. Distribution was accomplished by delivering copies to downtown businesses and residents, providing copies to the Chicago Convention and Tourism Bureau and entering into contracts with downtown hotels for lobby distribution and in-room placement by their maid services. Defendant estimated that a total of 160,000 copies of the 1981 Guide had been distributed, with hotel distribution accounting for about half of the total.

In February of 1981, Myron Levy, the plaintiff's general manager, met with Earl Polisky, a representative of the defendant, to discuss distribution of the Guide at the Midland. Levy testified that he agreed to defendant's distribution program and in return Polisky promised that the hotel would receive an outside back-cover ad on all of the Guides which were distributed in the hotel in addition to the "appropriate listings" under the "appropriate" headings in the Guide. Polisky, however, testified

that he only offered an outside back-cover ad on all Guides distributed in the hotel in exchange for the distribution service; he denied promising Levy any listings in exchange for distribution. Robert Hughes, defendant's vice-president of sales and marketing, testified that it was defendant's corporate policy to offer only a free back-page ad in exchange for hotel distribution.

When the 1981 Guide was released, the plaintiff was not listed under the "Hotels" heading in the Yellow Pages section; instead, it was listed under "Banquet Rooms." The plaintiff also received the back-page advertisement for the Guides to be distributed in the hotel. In the 1982 and 1983 editions of the Guide, the plaintiff was listed under the "Hotels" heading, "Banquet Rooms" heading and had two listings under the "Restaurant" heading.

The plaintiff sought $1,359,857 in lost net profits from July of 1981 to July of 1984. Net profits from July of 1982 to July of 1984 were sought as the consequence of the residual effect of being omitted from the 1981 Guide. John Jaeger, an accountant and plaintiff's expert witness, testified that the damages figure was arrived at by measuring the variance between the plaintiff's occupancy percentage and the average occupancy percentage of other downtown Chicago hotels as derived from a trade publication entitled, Trends In The Hotel Industry (Trends). Jaeger's calculation of lost occupancy assumed that plaintiff's occupancy percentage would have equalled the downtown Trends average for the three-year period. Jaeger then added the lost revenue from food and beverage sales as well as lost telephone revenue and deducted from this the plaintiff's variable expenses to arrive at the total lost net profits. Defendant's expert witness, James Adler, an accountant, testified that Jaeger's calculation of damages was invalid since it incorrectly assumed that plaintiff's occupancy percent-

age would have otherwise equalled the downtown Trends average. Adler noted that for numerous months *prior* to July of 1981, plaintiff's occupancy percentage was trailing the Trends average and that therefore there was no basis for the assumption that the plaintiff would have otherwise equalled the Trends average *after* July of 1981.

Defendant argues that there was no enforceable contract to list the plaintiff as a hotel. In support of this argument, defendant asserts that there was no credible evidence that defendant promised "appropriate listings," that there was no meeting of the minds between the parties and that the contract was too ambiguous to be enforced.

Defendant argues that there was no credible evidence as to the existence of a contract for "appropriate listings" since the only evidence of such a contract was Levy's testimony and Levy testified that he never discussed the number or placement of the listings in his meeting with Polisky. Defendant reasons that "[i]f the Midland had been offered Yellow Pages listings worth more than $1 million to the Midland, then Mr. Levy certainly would have discussed with Mr. Polisky the Midland's business, services and the available headings and reached an agreement on the number of listings and headings under which the Midland's telephone number would be listed." Moreover, defendant notes Levy's poor recall of the meeting with Polisky and characterizes Levy's testimony as "equivocal" since he first testified that he was promised an "appropriate listing" and then later testified that he was promised "appropriate listings."

It is the function of the jury to assess the credibility of witnesses and the weight to be accorded their testimony (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 309-10), and the jury's determination will not be overturned

unless contrary to the manifest weight of the evidence (*Bauske v. City of Des Plaines* (1957), 13 Ill. 2d 169, 181). As such, the sufficiency of the evidence is not contingent upon the sheer number of witnesses; a jury is free to credit the testimony of one witness against the conflicting testimony of several witnesses. Here, we cannot say that Levy's testimony was contrary to the manifest weight of the evidence. Levy's testimony that he was promised "appropriate listings" without inquiring as to the number or placement of the listings is quite plausible since he well could have entrusted such matters to defendant's expertise.

We agree with the appellate court that "[u]ltimately, this case turns on whether one chooses to believe plaintiff's witness, Levy, concerning the terms of the contract, or defendant's witnesses." (149 Ill. App. 3d 53, 60.) In our view, it is certainly not implausible that the defendant may have promised Levy "appropriate listings" in order to induce him to undertake distribution of the Guide.

Defendant contends that there was no enforceable contract to provide plaintiff with "appropriate listings" since there was no meeting of the minds between the parties on this term. Defendant argues that it only understood that it was to provide a free back-page advertisement in exchange for the distribution service. Thus, defendant asserts that even if the plaintiff understood that it was to receive "appropriate listings," there was still no meeting of the minds since there was no evidence that it shared this understanding.

In order for there to be a contract between parties there must be a meeting of the minds or mutual assent as to the terms of the contract; however, it is not necessary that the parties share the same subjective understanding as to the terms of the contract. (1 S. Williston, Contracts secs. 21, 22 (3d ed. 1957).) "It suffices that

the conduct of the contracting parties indicates an agreement to the terms of the alleged contract." (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 331.) Otherwise, a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates. As such, defendant's subjective understanding of the terms of the contract is immaterial. The jury found that the defendant promised "appropriate listings" and whether this promise accurately reflected the defendant's subjective intention is simply irrelevant.

Defendant next claims that a contract for "appropriate listings" is too vague and ambiguous to be enforced. Defendant argues that the term "appropriate listings" does not adequately specify the number or placement of the listings. Thus, it contends that this uncertainty renders the contract ambiguous since there are a number of appropriate listings for the plaintiff including: "Banquet Rooms," "Caterers" and "Cocktail Lounges."

The essential terms of a contract must be definite and certain in order for a contract to be enforceable. (*A. S. & W. Club v. Drobnick* (1962), 26 Ill. 2d 521, 525.) However, a contract "is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules ·of construction and applicable principles of equity, to ascertain what the parties have agreed to do." (*Morey v. Hoffman* (1957), 12 Ill. 2d 125, 131.) Defendant asserts that "appropriate listings" is too vague to be enforced since there are a number of appropriate listings for the Midland, but this misses the point. Plaintiff did not seek recovery because it was not listed under "Caterers" or "Cocktail Lounges." Plaintiff only sought to recover lost profits that were the result of its being omitted from the "Hotels" section and that the plaintiff should have been listed as a hotel was admitted by two of defendant's ex-

ecutives. Moreover, common sense alone would inform that a listing under "Hotels" would be "appropriate" for a business whose primary function concerns the provision of lodging.

If plaintiff had sued to recover lost profits resulting from its not being listed under "Caterers," a genuine issue of ambiguity may well be present. However, this is not the case before us. "It is not necessary or proper for us to construe in abstraction the terms of the agreement ***." (*Gale v. York Center Community Cooperative, Inc.* (1960), 21 Ill. 2d 86, 94.) Plaintiff only alleges that it should have been listed under "Hotels," and we hold that the term "appropriate listings" is not ambiguous in this respect.

Defendant next argues that plaintiff's proof of damages was speculative since plaintiff's calculation of lost profits erroneously assumed that plaintiff's occupancy rate would have equalled the downtown Trends average. Defendant maintains that as the plaintiff's occupancy rate had been consistently trailing the Trends average prior to the issuance of the Guide in July of 1981, there was therefore no basis upon which to conclude that the plaintiff would have otherwise performed as well as the Trends average. Plaintiff responds by noting that both Levy and Eugene Pekow, plaintiff's president, testified that the plaintiff's occupancy rate "tracked" the Trends average prior to July 1981. In addition, plaintiff notes that Adler, defendant's expert witness, admitted that for the 30-month period prior to July 1981 the Trends occupancy average was 62.83% while the Midland's average was 61.14%.

In order to recover lost profits, it is not necessary that the amount of loss be proven with absolute certainty. (*Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 310.) Being merely prospective, such profits will, to some extent, be uncertain and incapable of calculation with

mathematical precision. As such, "[a] recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty." (*Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289.) However, recovery of lost profits cannot be based upon conjecture or sheer speculation. (*Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 118.) It is necessary that the evidence afford a reasonable basis for the computation of damages; the defendant's breach must be plainly traceable to specific damages. Unless plaintiff can prove that the breach was the cause of lost profits, he is entitled to nominal damages only. (See *Harman v. Washington Fuel Co.* (1907), 228 Ill. 298, 301; 11 S. Williston, Contracts sec. 1345 (3d ed. 1968).) And since lost profits are frequently the result of several intersecting causes, it must be shown with a reasonable degree of certainty that the defendant's breach caused a specific portion of the lost profits. As the supreme court of Massachusetts stated:

> "The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. When the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies whose relation to the wrong complained of is problematical, and such profits are not provable with assurance as a trustworthy result of the alleged cause, then there can be no recovery." *Lowrie v. Castle* (1916), 225 Mass. 37, 51-52, 113 N.E. 206, 210.

Here, the record indicates that during the first six months of 1979, the plaintiff's occupancy levels exceeded the Trends average by large margins. Thereafter, however, the plaintiff's occupancy levels began a steady decline. Only occasionally did the plaintiff perform as well as the Trends average; in 19 of the 24 months preceding

July of 1981, the plaintiff trailed the Trends average. In the two months prior to July 1981, the Midland was considerably below the Trends average: in May by 14% and in June by 12%. Plaintiff argues that it tracked the Trends average because in the 30-month period prior to July 1981, the plaintiff's occupancy average was only one percentage point below the Trends average for the same period. This statistic, however, is misleading since a 30-month average does not sufficiently illuminate the plaintiff's downward tendency immediately preceding July 1981 but rather reflects the plaintiff's substantial gains in early 1979.

After the 1981 Guide was issued, the disparity in occupancy levels between the plaintiff and the Trends average continued to widen. When the 1982 edition of the Guide was issued with the plaintiff listed as a hotel, this disparity widened yet further. And while it is possible that plaintiff's omission from the 1981 Guide may have resulted in residual effects, it is difficult to believe that such residual effects could account for losses so great. If exclusion from the Guide caused substantial losses, as plaintiff contends, then it is only reasonable to expect that inclusion would result in at least modest gains. Moreover, the record furnishes no basis for plaintiff's claim that such residual effects lasted for two years rather than one, three or five years. Plaintiff could have as easily asserted that the residual effects of its omission from the Guide caused the entire variance in occupancy between the plaintiff and Trends for seven, eight or ten years thereafter.

Plaintiff's proof of lost profits assumes that it would have performed as well as the Trends average; however, it is clear that this assumption is erroneous since there were evidently other factors that were causing it to perform below the Trends average even before the 1981 Guide was issued. Plaintiff has failed to isolate the

amount of lost profits, if any, attributable to its omission from the Guide. Accordingly, we cannot say that lost profits in the amount of $500,000 were proven with reasonable certainty.

Finally, we consider whether the trial court properly refused a jury instruction that lost profits must have been within the reasonable contemplation of the defendant when the contract was formed. The appellate court held that the instruction was improperly refused. The court, citing *Hadley v. Baxendale* (1854), 9 Ex. 341, 156 Eng. Rep. 145, reasoned that where, as here, lost profits are sought for transactions collateral to the original contract, it must be shown that the lost profits were within the reasonable contemplation of the defaulting party.

In *Hadley v. Baxendale* the court stated what has become the general rule of foreseeability in contract actions:

> "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i.e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." (9 Ex. 341, 354, 156 Eng. Rep. 145, 151.)

Thus, *Hadley* provides that all damages which naturally and generally result from a breach are recoverable; it is only where damages are the consequence of special or unusual circumstances that it must be shown that the damages were within the reasonable contemplation of the parties. (See also 11 S. Williston, Contracts sec. 1344 (3d ed. 1968); 22 Am. Jur. 2d *Damages* sec. 56 (1965).) Here, the appellate court viewed the Midland's lost profits as collateral to the contract with the defendant

and therefore held that it was for the jury to decide whether such lost profits were within the reasonable contemplation of the defendant. However, the court's characterization of the lost profits as collateral to the contract with defendant is contrary to both defendant's own assertions and the very nature of a Yellow Pages listing. In one of the promotional brochures for the Guide, the defendant stated, "Your ad in the *Chicago Visitor's Guide and Downtown Directory* will tell a prospective buyer about your products or service at just the time this potential customer is looking to be TOLD and SOLD." In another brochure, defendant proclaimed, "Chicago attracts people who spend money *** 5.5 million people spending over 551 million dollars." Moreover, the very purpose of a Yellow Pages listing is to increase profits. The value of a Yellow Pages listing is not the dissemination of a business identity as an end in itself but is rather a means towards attracting new customers and stimulating new growth and thereby increasing profits. Clearly, the plaintiff's profits formed the very basis of its contract with defendant; it cannot be said that such profits were only collateral to the contract. Thus, as plaintiff's lost profits were a direct and foreseeable consequence of defendant's breach as a matter of law, the trial court properly refused to tender a "reasonable contemplation" instruction to the jury. (See *Postal Telegraph Cable Co. v. Lathrop* (1890), 131 Ill. 575; *Providence-Washington Insurance Co. v. Western Union Telegraph Co.* (1910), 247 Ill. 84.) Accordingly, we hold that the appellate court erred as to this issue.

This court has held that a new trial limited to the question of damages will only be granted where (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the question of liability and damages are sufficiently distinct such that a trial limited to the question of damages would not be unfair to the

defendant; and (3) the record does not suggest that the jury reached a compromise verdict. (*Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224.) These factors reflect a concern that where issues of liability and damages are closely intertwined, a new trial limited to the issue of damages would unfairly permit the plaintiff to circumvent the necessary proof of liability. It therefore must be clear from the record both that there was sufficient evidence to find defendant liable, and that the jury did not confuse the issues of liability and damages. We have already concluded that there was sufficient evidence to find defendant liable and here it is clear that the jury did not confuse the issues of liability and damages. The jury responded affirmatively to the following special interrogatory:

> "Was there a contract between plaintiff and defendant which entitled plaintiff to a listing under more than one business heading in the Chicago Visitors Guide?"

Thus, the jury's response indicates that it found the defendant liable notwithstanding its award of damages. As such, we perceive no prejudice to the defendant in a trial limited to the issue of damages.

For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part, and the cause is remanded to the trial court for a new trial limited to the issue of damages.

*Appellate court affirmed in part and reversed in part; cause remanded.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.