Larry **BAKER**, Robert C. Campbell, George Ditola, John Kennedy and John Zochowski, Plaintiffs–Appellants,

v.

**ELMWOOD DISTRIBUTING, INC.**, City and Suburban Distributors–Illinois, Inc., Franklin D. Raines, and Vierk Distributing Co., Defendants–Appellees.

No. 90–2466.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1991.

Decided Aug. 13, 1991.

**1014**

David Letvin (argued), Letvin & Stein, Chicago, Ill., for plaintiffs-appellants.

Judson H. Miner, Jeffrey Cummings (argued), Davis, Miner, Barnhill & Galland, Louis R. Hegeman, Gould & Ratner, William G. Hutul, James R. Sneider, Sneider & Troy, Chicago, Ill., William A. Vlasek, William W. Winterhoff, Winterhoff & Associates, Lansing, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and WOOD, Jr., and POSNER, Circuit Judges.

BAUER, Chief Judge.

This reverse discrimination suit under 42 U.S.C. § 1981 has been kicking around the federal courts for over eight and a half years. In what we hope is the end of the line, we herein affirm the district court's entry of summary judgment against the Plaintiffs–Appellants. The district court held that their claims are foreclosed by *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), and we agree.

I

The events that gave rise to this lawsuit occurred back in 1981. For most of that year, Plaintiffs–Appellants, all white men, delivered beer for Metropolitan Distributors South, Inc. Then, in early September of 1981, Metropolitan sold part of its franchise to Elmwood Distributing, Inc., whose president and sole shareholder was Franklin D. Raines, a black man. Raines chose Robert Harley, also a black man, as the new general manager of Elmwood. Harley had been a sales manager for Metropolitan.

Plaintiffs–Appellants (henceforth "the Drivers") learned on September 4, 1981, which was a Friday, that Elmwood had purchased that portion of Metropolitan's franchise that covered their territories. Immediately, the Drivers contacted Harley to determine whether they would have jobs the following week. According to their depositions, the Drivers were assured by Harley that, although they should formally reapply, they would be retained by Elmwood. *See, e.g.,* Deposition of John Zochowski at 15 ("[Harley] said, 'As far as I am concerned you are hired. You got the job. I am honoring the [union] contract. Fill out an application anyway.'"); Deposition of Robert Campbell at 36 ("[Harley] told me that my job was—would be there when I came back Tuesday [September 8th], and he was keeping all the help in that area, and he told us our job[s were] secure."). The Drivers did in fact apply for employment with Elmwood, and Harley received their applications.

Based on Harley's representations, the Drivers (all but Larry Baker) showed up for work as usual on Tuesday, September 8—Monday the 7th was the Labor Day holiday. Baker did not show because, after he was told by Harley on the 4th that he had a job with Elmwood, he went on vaca-

tion. With the exception of some slight route changes, the other Drivers delivered beer for Elmwood on September 8th and 9th just as they had for Metropolitan. As they expected, the Drivers (again, all but Baker) were paid by Elmwood for the hours they worked on the 8th and 9th, as well as for the Labor Day holiday.

Then, at the end of the day on September 9th, the bottom dropped out. Harley called all of Elmwood's drivers and helpers together that evening for a meeting. According to the Drivers' allegations, Harley told the assembled employees that Elmwood was getting pressure from black organizations that it had "too much white help," and that therefore some of the white employees had to be terminated. Harley then read off a list of the employees who would keep their jobs. The Drivers were not on that list. (Baker was not at the meeting because he was still out on vacation. Waiting for him when he returned home was a telegram from Harley that stated, "Your employment services will no longer be needed." The telegram did not state that the termination was due to Baker's race.)

In January 1983, the Drivers filed suit against Elmwood in federal district court, complaining that Elmwood had fired them because of their race in violation of 42 U.S.C. § 1981. The following month, Elmwood sold substantially all of its assets (and unloaded its liabilities) to City and Suburban Distributors—Illinois, Inc. ("C & S"). In November 1985, the Drivers filed an amended complaint adding C & S as a defendant under the successorship doctrine. See *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir.1985).[1] In August 1986, the Drivers filed a second amended complaint adding Raines as a defendant, charging that Harley's actions on Septem-

ber 9th "were taken and made under the supervision, control and direction of Defendant Raines, and the discharge of the [Drivers] was made with Raines' approval for the reason of their race." ¶ 7. In April 1988, C & S sold substantially all of its assets to Vierk Distributing Co. The district court thereafter allowed the Drivers to file a "Supplemental Complaint" adding Vierk as a defendant, again under the successorship doctrine.

Thus, between January 1983 and April 1988, the Drivers filed a total of four complaints against Elmwood and a growing list of additional defendants. In all four complaints, the Drivers alleged that they were hired by Elmwood on September 4, 1981, that they were employed by Elmwood until September 9, 1981, and that they were then fired by Elmwood solely because of their race. The defendants, for their part, denied these allegations, and raised as well various procedural and affirmative defenses. Specifically, in his deposition testimony, Raines testified that none of the Drivers ever was hired by Elmwood. He agreed that all but Baker "worked a number of days for Elmwood," but he stated that that occurred merely "at the insistence of the Teamsters Union." Raines Deposition at 61.[2] As for why the Drivers "were not invited to be employees of Elmwood," Raines testified that it had nothing to do with race. *Id.* at 93–95. In his deposition, Harley also stated that the Drivers never were hired by Elmwood. As for those few days in September when the Drivers worked for Elmwood, Harley explained that Raines and the Teamsters decided to "let it go status quo" until a new collective bargaining agreement ("CBA") could be negotiated. Harley Deposition at 40. In February 1989, the district court deter-

---

**1.** The Drivers actually attempted to file an amended complaint in June 1983, soon after they learned of the sale of assets to C & S, but the district court denied their motion for leave to amend. That same district judge, on his own motion and without notice to the Drivers, dismissed the Drivers' suit with prejudice about one year later. In an unpublished order dated August 15, 1985, we reversed that dismissal and vacated the district court's denial of the Drivers' motion to amend. The case was remanded and

reassigned to a different district court judge, who allowed the Drivers to amend their complaint in November 1985.

**2.** Metropolitan's beer truck drivers and helpers had been represented by the Teamsters Union. When Elmwood purchased the franchise, the Teamsters entered into immediate negotiations with Raines.

mined that all of this created a jury question as to whether the Drivers actually were discharged for racially discriminatory reasons, and therefore denied Raines' summary judgment motion.

Then came *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In that case, the Supreme Court held that § 1981's prohibition on discrimination "covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." *Id.* at 179, 109 S.Ct. at 2374. The Court thus rendered § 1981 inapplicable to racial harassment and all other "conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.* at 171, 109 S.Ct. at 2369. The Court did not explicitly foreclose claims of discriminatory discharge under § 1981, but every Circuit (including this one) that since has addressed such claims has held that they are no longer viable after *Patterson. See Taggart v. Jefferson County Child Support Enforcement Unit* 935 F.2d 947, 948 (8th Cir.1991) (*en banc*) (collecting cases from seven other circuits that have held that *Patterson* precludes discriminatory discharge claims, which list includes *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991)). In addition, we have held that *Patterson* applies retroactively to cases that were not yet final when it was decided. *See Bailey v. Northern Indiana Public Service Co.*, 910 F.2d 406, 407 (1990).

With this freight train coming at them, the Drivers quickly changed tracks. In August 1989, they sought and obtained leave to file a third amended complaint, in which they abandoned their discriminatory discharge claims. The Drivers now alleged that, although they may have *believed* they were hired (and then fired) by Elmwood, that's not what really happened. Elmwood actually refused to hire them, Drivers alleged, and did so because of their race. What the Drivers were trying to do, of course, was recast their claims so that the alleged discrimination occurred pre-contract formation and thus came within the post-*Patterson* scope of § 1981.

It didn't work. In an order dated May 11, 1990, the district court granted C & S's motion for summary judgment based on *Patterson*. The court acknowledged and discussed the Drivers' new position, but concluded nonetheless that "[t]here is no genuine dispute in this case that [Drivers] were hired by Elmwood." *Baker v. Elmwood Distributing, Inc.*, No. 83 C 215, slip op. at 4 (N.D.Ill. May 11, 1990) [available on WESTLAW at 1990 WL 71037]. Given that fact, the only claim the Drivers could be making is that they were fired because of their race, a claim foreclosed by *Patterson*. Thus, the court entered judgment in favor of the defendants and dismissed the Drivers' action "in its entirety." In that same judgment, the court also certified, "There being no just reason for delay, this is a final and appealable order." Two weeks later, the Drivers filed a post-judgment motion under Fed.R.Civ.P. 59, which was denied. The Drivers brought a timely appeal.

## II

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). "A genuine issue of material fact exists only when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Santella v. City of Chicago*, 936 F.2d 328, 331 (7th Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (quotation omitted). This standard does not mean that summary judgment is

proper only when all parties agree on all facts. As we have stated many times before, "The existence of a factual dispute does not necessarily preclude summary judgment...." *Doe v. Small*, 934 F.2d 743, 751 (7th Cir.1991) (citing *Korf v. Ball State Univ.*, 726 F.2d 1222 (1984)). *See also Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). Further, although we view the evidence and all reasonable inferences that can be drawn from it in the nonmovant's favor, it is not enough for the nonmovant merely to raise factual arguments that cast "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. In sum, the nonmovant—here, the Drivers—must show that the record contains a bona fide, bipolar dispute as to some dispositive factual issue "that properly can be resolved only by a finder of fact." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. We review *de novo* the district court's determination that the Drivers did not meet this burden. *See Santella*, at 331.

The Drivers argue that summary judgment was improper here because the evidence revealed a "genuine dispute" as to "whether there was a meeting of the minds, or mutual assent, about whether [the Drivers] were to be employed or continue to be employed by Elmwood." Plaintiffs–Appellants' Brief at 31. The primary "evidence" to which the Drivers point is the deposition testimony of Raines and Harley, wherein they stated that, as far as they were concerned, the Drivers never were hired by Elmwood. In an interesting piece of footwork, the Drivers attempt to sidestep their own deposition testimony and pleadings—wherein they repeatedly stated that they were hired by Elmwood—by arguing that Harley's statements only made them *think* they were hired. Their subjective understanding, they assert, is irrelevant.

The Drivers are right about that much; their subjective belief that they were hired by Elmwood is not the ballgame. But—and they completely gloss over this point—the same goes for Raines' and Harley's beliefs. In other words, Raines' and Harley's deposition testimony concerning whether they considered the Drivers "hired" is equally beside the point. What matters here is whether the evidence reveals a bona fide, material dispute as to whether the Drivers were hired, such that the district court was precluded from taking that issue from the jury. A clash of subjective understandings would not be such a dispute, because the focus under Illinois law is on the *conduct* of the parties and whether that conduct objectively manifested assent to an agreement. *See Midland Hotel v. Reuben H. Donnelley*, 118 Ill.2d 306, 113 Ill.Dec. 252, 256, 515 N.E.2d 61, 65 (1987):

> In order for there to be a contract between parties there must be a meeting of the minds or mutual assent as to the terms of the contract; however, it is not necessary that the parties share the same subjective understanding as to the terms of the contract. (1 S. Williston, Contracts secs. 21, 22 (3d ed. 1957).) "It suffices that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract." (*Steinberg v. Chicago Medical School* (1977), 69 Ill.2d 320, 331, 13 Ill.Dec. 699, 371 N.E.2d 634.) Otherwise, a party would be free to avoid his contractual obligations by simply denying that which his course of conduct indicates. As such, defendant's subjective understanding of the terms of the contract is immaterial.

*See also* 12 Illinois Law and Practice *Contracts* § 9 (West 1983) ("Generally, it is the objective manifestation of intent which controls whether a contract has been entered into; subjective understanding of the parties is not required in order for there to be a meeting of the minds.") (citations omitted); Restatement (Second) of Contracts § 19 (1981) ("Conduct as Manifestation of Assent"), *cited in Steinberg* 13 Ill.Dec. at 705, 371 N.E.2d at 640. *Cf. Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921,

929 (7th Cir.1991) (In diversity breach-of-contract case, appellant challenged propriety of summary judgment claiming that "there were genuine issues of material fact concerning whether there was a meeting of the minds as to [the parties'] intent to renew [their] contract;" applying Illinois law, we affirmed and stated, " 'intent' in contract law is objective rather than subjective and, therefore, not a question of fact.") (quotation and citation omitted).[3]

■ What was the parties' conduct here? Taking, as we must, the Drivers allegations as true on these matters, the parties' actions essentially amounted to these: Elmwood, through Harley, assured the Drivers they were hired by Elmwood; the Drivers (all but Baker) showed up for work and delivered beer for Elmwood for two days; and then Elmwood paid the Drivers (again, except Baker) for those days of work. Paraphrasing the old saying about ducks, the conduct of Elmwood and the Drivers looked like an employment agreement, walked like an employment agreement, sounded like an employment agreement, .... If presented with this evidence, a rational jury could only conclude, as did the district court, that the Drivers were in fact hired and then fired by Elmwood.[4] Thus, the Drivers are left with the version of their § 1981 claim they advanced in their first four complaints: discriminatory discharge. That claim is a loser after *Patterson.*

In a final attempt to avoid this fate, the Drivers suggest one other theory: although they worked for Elmwood, they were only "temporary" employees pending the successful negotiation of a new CBA between the Teamsters and Raines. Once a CBA was negotiated, the argument goes, an opportunity was presented for a new contractual relationship between Elmwood and the Drivers; an opportunity that was denied because of race. *See Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377 (denial of promotion claims actionable under § 1981 only if denial of "an opportunity for a new and distinct relation between the employee and the employer"). *See also McKnight,* 908 F.2d at 109–10 (discussing and applying *Patterson*'s test for promotion claims). The Drivers again rely heavily on Raines' deposition testimony, in which he details his negotiations with the Teamsters and states that it was the Teamsters and not he who told the Drivers to work in the interim before the new CBA was signed.

■ Again, the Drivers come up short. First, it should be noted that it is not a rule in labor law that one is not "hired" until a CBA is in place covering his employment, or that the pendency of negotiations between one's new employer and his union mean that he is not "employed." In fact, successor employers are far from free to ignore the employment agreements entered into by their predecessors; many obligations and employee protections live on. *See generally* 1 C. Morris, *The Developing Labor Law,* ch. 15, pp. 694–756 (2d ed. 1983) (discussing successorship law and the leading cases of *Howard Johnson Co., Inc. v. Detroit Local Joint Bd.,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v.*

---

**3.** We turn to general contract principles accepted in the common law of Illinois because we find no compelling reason—such as a statutory directive from Congress or a conflict with some federal policy or interest—to displace state law in this case in favor of federal common law. *See generally Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (declaring that state substantive law should apply in private contract dispute that did not affect the federal government).

**4.** Although Baker did not work for and was not paid by Elmwood, the record evidence concerning his dealings with Elmwood similarly leads to only one conclusion: he was hired and then fired. In his deposition, Baker recounts that Harley told him "that its okay to go on vacation and not to worry about it, that I would have a job when I came back." Baker Deposition at 34. In addition, Baker's "pink slip" telegram from Elmwood did not say, "You are not hired," but "Your employment services will no longer be needed."

In any event, even if there is some factual predicate to support treating Baker differently (as counsel for the Drivers suggested at oral argument), at no prior point in this case has either party requested the separation of Baker's claim from the claims of the other Drivers; and oral argument is too late. *See Bailey,* 910 F.2d at 409–10 n. 2 (failure to raise a point until oral argument "is normally held to equal waiver of that point").

*Burns Int'l Detective Agency, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); and *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)). Second, we are unconvinced that *Patterson*'s "new and distinct relation" test for promotion claims actionable under § 1981 should be applied at all to the Drivers' claims. There is no evidence that the Drivers applied for and were denied positions different in any way from the jobs they had with Metropolitan—and, for two days, with Elmwood. Beer truck drivers and helpers they were, and beer truck drivers and helpers they remained. (It does not even appear that Elmwood paid them any differently than did Metropolitan.) Moreover, recognition that the Drivers' claims fall under *Patterson*'s promotion inquiry would imply that every time a company changes hands, and that change necessitates a new CBA with the union, all employees are presented with "an opportunity for a new and distinct relation" with their employer, even if their positions and benefits under the new CBA (or, as here, in the interim) are identical. We refuse to expand *Patterson* so obviously beyond its intended parameters.

### III

The Drivers' attempt to sidestep *Patterson* is unsuccessful—if ·understandable. As have many, more traditional discrimination claimants, the Drivers have found themselves "shipwrecked ... upon 'the treacherous and shifting shoals of present-day federal employment discrimination law.'" *Bailey,* 910 F.2d at 414 (quoting *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1313 (7th Cir.1989)). The district court's judgment dismissing this action is

AFFIRMED.