**Marita DECKER, Plaintiff,**

**v.**

**ANDERSEN CONSULTING, Defendant.**

**No. 93 C 5807.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 19, 1994.

George Freeman Galland, Jr., Jeffrey Irvine Cummings, Davis, Miner, Barnhill and Galland, P.C., Chicago, IL, for plaintiff.

John A. McDonald, Keck, Mahin & Cate, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff Marita Decker ("Decker") filed a four-count complaint against Defendant Andersen Consulting ("Andersen") alleging Title VII violations based on sex and pregnancy discrimination and retaliation and two pendent state claims for breach of contract and promissory estoppel. In response, Andersen filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Andersen's motion is denied.

## I. FACTUAL BACKGROUND

In ruling on Andersen's motion for summary judgment, this court must construe the record in a light most favorable to Decker, the non-movant, and accord her the benefit of all reasonable inferences. See, e.g., Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir.1994); Jaskowski v. Rodman & Renshaw, Inc., 842 F.Supp. 1094, 1096 (N.D.Ill.1994). Consequently, the Court sets out the facts of this case as they are alleged in Decker's complaint and sworn to in her affidavit, and as further set out in the parties' documentation supporting the motion.

Andersen is a partnership involved in the delivery of management consulting services to its clients and is affiliated with the worldwide firm of Arthur Andersen & Co. Andersen is engaged in an industry affecting commerce within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. Decker joined Andersen's Chicago office in 1982 and left in 1984, when she moved to Springfield, Illinois. From 1984 to 1986, Andersen retained Decker as a paid consultant. Upon returning to Chicago in 1986, Decker was reemployed by Andersen and was promoted from her former position as a "senior" (the highest non-managerial position) to the level of manager. Throughout her years at Andersen, Decker's work was consistently evaluated as outstanding and she was identified early on by her supervisors as a likely candidate for partner. Decker received glowing formal evaluations from her superiors and was eventually promoted to

"associate partner," one level below partner, in September 1991.

Andersen's management structure consists of multiple levels. Decker reported to Carla Paonessa, the head of Andersen's Change Management Services (CMS) division. In turn, Paonessa reported to Dean Taylor, managing partner of Andersen's Chicago office. Taylor reported to Stephan James, managing partner of the Central Region of Andersen's four Americas regions. During the relevant time period, John Kelly was the managing partner of the Americas Operations Group ("AOG"), a team of partners who manage the Americas regions.

In addition to her work in CMS, Decker also contributed a significant amount of time in Andersen's Technology Services (TS) division, serving as Andersen's liaison to the Institute for Learning Sciences (ILS), a joint venture between Andersen and Northwestern University. Her superiors on that assignment were Bruce Johnson and Alain Legendre, both of whom reported to James Fischer, managing partner of TS.

One criterion Andersen uses to evaluate candidates for partner is "chargeable" hours (hourly billings to clients). Decker's chargeable hours were lower than those of other managers, primarily because her work on the ILS joint venture was not chargeable. Yet, hours worked on ILS are significant to Andersen, even if they are not chargeable.

In the spring of 1991, Fischer urged Decker to transfer from CMS to TS so she could concentrate her efforts on the ILS joint venture. However, Paonessa urged Decker to remain in CMS and said that a transfer would hurt Decker's chances to make partner in 1992. Decker then sought advice from Taylor, who suggested she formally remain in CMS but devote 80 percent of her time to TS.

Decker asked Taylor about the effect transferring full-time to TS would have on her chances of making partner, since her work at ILS was not chargeable. Taylor told Decker that chargeability would not be an issue when she was considered for partnership and that he would inform the appropriate persons who would be reviewing her can-

didacy for partnership that he had made this commitment. Decker then met with Charles Winslow, the world-wide managing partner of CMS. Winslow told Decker to remain in CMS and said words to the effect that her career at Andersen would be through if she decided to transfer. After discussing the matter with Fischer and Paonessa, Decker again spoke with Taylor. She stated that partnership was important to her and wanted reassurance from Taylor that chargeability would not be held against her. Once more, Taylor told Decker that chargeability would not be an issue in her partnership consideration.

As agreed, Decker began working under the 80/20 format but remained formally assigned to CMS. In October 1991 Decker learned she was pregnant. Around that time, Paonessa proposed Decker for partnership admission in September 1992. Decker's candidacy was approved by the Chicago office, which submitted Decker and seven other candidates to the Central Region. In January 1992, James approved Decker and five other persons; Decker was ranked fourth out of six.

In January 1992 Decker was becoming visibly pregnant and informed Paonessa and Legendre that she was pregnant. Paonessa requested that Decker not inform any other partners about the pregnancy. On February 7, 1992, Charles Winslow, managing partner for CMS, left Decker a voicemail message in which he reproached her for not being more forthcoming about her pregnancy. Later that month, Decker was asked to schedule a screening interview (the final interview of the partnership process) with Skip Battle. The interview was scheduled for March 4, 1992.

In late January 1992, however, the top partners of the AOG, including Winslow, Taylor and James, met and discussed Decker as a candidate for partner. Defendants assert that the AOG withdrew Decker's candidacy at that time. Defendant's Statement of Undisputed Material Facts, at 9–10, ¶¶ 52–55; James Dep., Tab 1 to Defendant's Evidentiary Materials in Support of Motion for Summary Judgment, at 53–54. Decker disagrees and asserts that she was not withdrawn as a candidate until February or

March. According to Decker, Paonessa informed her on March 4, 1992, that she had been withdrawn as a candidate for partner and that her interview with Battle, scheduled for later that day, had been cancelled. Paonessa explained that Decker was withdrawn because she was only a "six-year" candidate and lacked chargeability. Decker immediately went to Taylor for his explanation. Taylor told Decker that she was ranked fourth out of the six candidates recommended by the Central region, and the other five were still under partnership consideration. Taylor said, among other things, that Decker was withdrawn because of her low chargeability.

Decker also met with Fischer on March 4. After hearing the reasons Decker had received from Paonessa and Taylor, Fischer said the partnership decision seemed unfair and suggested that discrimination might be the reason she was withdrawn. Over the next few weeks, Decker met with several different people and received several different explanations for her partnership denial.

On May 5th, Decker again met with Fischer, who said he would resubmit Decker for partnership admission in 1993. At Fischer's suggestion, Decker transferred full-time to TS after returning from maternity leave in September 1992. Upon her return, Decker worked on the ILS project for Legendre and on other projects with Joe Carter, a partner in TS. In November, Decker told Fischer and Paonessa that she intended to file a pregnancy discrimination claim in connection with her partnership denial. Bob Prince, Andersen's managing partner of human resources, met with Decker to discuss her claim. Andersen agreed to waive the 300–day limitation period so that Prince could have time to respond to Decker's complaint.

Discussions between Decker and Prince, however, did not resolve the dispute. On January 27, 1993, Decker filed sex and pregnancy discrimination charges with the Equal Employment Opportunity Commission, which issued her a right-to-sue letter in August 1993. Until July 1993 Decker continued working at Andersen as an associate partner. In July, Andersen offered Decker partnership. Decker met with several Andersen partners but ultimately declined to accept the offer because of unacceptable conditions that Andersen allegedly created. After Decker met with Prince and Fischer, Prince asked her to resign or be terminated. She resigned on August 31, 1993, and filed this lawsuit on September 22, 1993.

## II. DISCUSSION

Summary judgment is appropriate where the record demonstrates that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See FED.R.CIV.P. 56; Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Seventh Circuit has described the "practical" test of a summary judgment motion as "whether the nonmovant has a fighting chance at trial." Shager v. Upjohn Co., 913 F.2d 398, 403 (7th Cir.1990). Therefore, in order to survive Andersen's motion, Decker "need only present evidence from which a jury might return a verdict in [her] favor. If [s]he does so, there is a genuine issue of fact that requires a trial." Liberty Lobby, 477 U.S. at 257, 106 S.Ct. at 2514.

This court recognizes that summary judgment analysis "is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Sarsha, 3 F.3d at 1038. This scrutiny is appropriate because "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Liberty Lobby, 477 U.S. at 255, 106 S.Ct. at 2513. The Seventh Circuit has repeatedly noted that summary judgment is often an inappropriate method of resolving Title VII claims in which the defendant's intent is the central issue. See, e.g., Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1261 (7th Cir.1993); Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir.1989); Powers v. Dole, 782 F.2d 689, 694 (7th Cir.1986) (summary judgment in Title

VII cases should be approached with "special caution"). "[T]he issue of discriminatory intent is often only subject to proof by circumstantial evidence, which makes summary judgment a seldom useful tool for resolving such issues." *Friedel v. City of Madison,* 832 F.2d 965, 972 (7th Cir.1987).

### A. *Count 1—Sex/Pregnancy Discrimination*

■ Title VII of the Civil Rights Act prohibits discrimination in employment because of an individual's sex. 42 U.S.C. sec. 2000e–2(a)(1). Typically, a plaintiff claiming Title VII violations must first establish a *prima facie* case through direct or circumstantial evidence or, more commonly, through the indirect, burden-shifting method of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* analysis, establishing a *prima facie* case creates a rebuttable presumption of discrimination and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment decision. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). If the employer makes such a showing, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's reasons were a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1094.

■ On a summary judgment motion, however, the Seventh Circuit recently concluded that a plaintiff alleging discrimination has a lesser burden:

Both *McDonnell Douglas* and *Hicks* speak to the burden the plaintiff bears at trial. However, for summary judgment purposes, the non-moving party, in this case the plaintiff, has a lesser burden. He must only "produce evidence from which a rational fact-finder could infer that the company lied" about its proffered reasons. . . .

*Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1994), *quoting Shag-*

*er v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990). Thus, in order to avoid summary judgment, Decker need only show that a rational fact-finder could infer that Andersen lied about its proffered reasons for not offering her partnership in 1992.

■ Andersen concedes that Decker has a *prima facie* case, but asserts several reasons for its treatment of Decker which it claims are legitimate, non-discriminatory business justifications. Thus, at this stage of the proceedings the burden shifts back to Decker to "offer proof which casts doubt on the veracity of the employer's stated reason for its actions." *Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 98 (7th Cir.1985); *see also Seitz v. Peat Marwick Main & Co.,* 704 F.Supp. 157, 161 (N.D.Ill.1989). "The point is only that if the inference of improper motive *can* be drawn, there must be a trial." *Shager,* 913 F.2d at 401 (emphasis in original).

Assessing the record in a light most favorable to Decker, a rational fact-finder could infer that Andersen lied about its reasons for not admitting Decker to the partnership in 1992. Initially, Andersen claims that Decker was withdrawn by Winslow, James and Taylor on January 22, 1992, at the AOG meeting. Decker, however, states that she was not withdrawn until February or March, by which time everyone knew she was pregnant. According to the proffered evidence, on February 13th, Decker met with Paonessa, who said she had spoken to Kelly, and Decker's candidacy was "not out of the woods" yet. Later that month, Taylor's secretary called Decker to set up the March 4 screening interview with Battle. In addition, Fischer told Decker that no decision was made about her at the January meeting. These facts contradict Andersen's claim that Decker was withdrawn in January and support the inference that Decker was not withdrawn until late February or March, when her pregnancy was visible to everyone.

Andersen's proffered reason for the withdrawal of Decker is that Kelly questioned Decker's recent ability (1) to produce sustained results in selling and managing work in CMS, and (2) the fact that ILS had pro-

duced no major results. There are clearly enough facts to raise an inference of improper motive about both of these explanations. Decker's partnership nomination file explicitly stated that "Decker sells a lot of work." Exhibit M, p. AC03902.[1] That file further indicates that she sold $2.5 million and $1.6 million, respectively, in fiscal years 1991 and 1992, and sold $500,000 in the first two months of 1992. Most impressively, Decker achieved these numbers despite the fact that she was spending a significant amount of her time in a non-selling position at ILS.

Andersen's claim that Kelly was concerned that ILS had produced no major results is unsupported in Kelly's deposition testimony. Kelly expressed concern over Decker's ability to work with clients, but her work was always evaluated as outstanding. Moreover, Decker's partnership nomination file repeatedly praises her work at ILS and her work for clients:

> "It is generally recognized among the partners involved with ILS that Marita is making a major contribution to the firm." Ex. M, p. AC03953.

> "When getting other feedback from partners who have worked with her there, the response was 'outstanding, outstanding, outstanding.' The people staffed at ILS say 'the world is different for them since she is there.'" Ex. M, p. AC03945.

> "She brings outstanding skills to selling opportunities and client projects that she is involved in." Ex. M, p. AC03965.

> "She has become totally conversant in multiple platforms and software packages, which allows her flexibility and credibility in all kinds of client situations." Ex. M, p. AC03978.

In addition to Kelly's unsubstantiated concerns, Winslow reproached Decker in February 1992 for not being more forthcoming about her pregnancy. Winslow also admitted in his deposition that he signed and sent a letter supporting Decker's candidacy, even though he supposedly knew her name had already been withdrawn. Winslow Dep., Exhibit B, at 110–111. When the complete record is viewed in a light most favorable to

Decker, the inference of improper motive by Andersen clearly may be drawn. Therefore, Andersen's motion as to Count 1 is denied.

### B. *Count 2—Retaliation*

In addition to the actual practice of discrimination, Title VII prohibits an employer from "retaliating" against an employee.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. sec. 2000e–3(a). To establish a *prima facie* case of retaliation under Title VII, Decker must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action. *Holland*, 883 F.2d at 1313. Actual discrimination need not occur, for "it is sufficient if the plaintiff has a reasonable belief that she is challenging conduct [that violates] Title VII." *Holland*, 883 F.2d at 1314.

The first two elements are undisputed in this case. First, Decker filed her charge of sex and pregnancy discrimination with the EEOC on January 27, 1993. Second, Prince told Decker to resign or be terminated on August 31, 1993. Thus, the critical inquiry becomes whether there is a causal link between Decker's protected expression and Andersen's decision to terminate her. Generally, a short period of time between the protected activity and the adverse action is sufficient to raise the inference of a causal link. *Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir.1991); *Collins v. Illinois*, 830 F.2d 692, 705 (7th Cir.1987). Conversely, a lengthy time period discounts such an inference. *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1115 (7th Cir.1992).

Standing alone, a period of five months has been held insufficient to raise an

---

**1.** All Exhibits cited by letter are to Pl.'s Rule 12(n) Resp. in Opp. to Def's.Mot. for Summ.J.

inference of a causal link. *Maldonado v. Metra*, 743 F.Supp. 563, 568 (N.D.Ill.1990). We agree. Therefore, Decker cannot simply rest on the six month period to raise the inference of a causal link. She does point to specific facts in her affidavit, however, to overcome a summary judgment motion. Decker avers that although Andersen purported to reevaluate her for admission to the partnership in 1993, Andersen actually took several steps after January 1993 to retaliate against her. First, against Decker's strong opposition, Andersen released an internal memorandum marked "strictly confidential" to Roger Schank, the director of ILS. Decker's memorandum sharply criticized Schank's' management; Andersen's release destroyed Decker's working relationship with him and with the ILS. Decker asked to attend the meeting with Schank but was refused permission, despite her outstanding contributions to the ILS project and excellent formal evaluations from the partners working on the project. The inference of retaliation is strong under these circumstances.

Second, Decker cites several instances in which Carter, one of her supervisors at TS, refused to assign her any managers, seniors or other staff, despite Decker's repeated requests. On several occasions, Decker says Carter told her that no one would be reporting to her. In light of the excellent evaluations Decker had theretofore received, and her forthcoming partnership offer, the lack of responsibility and assignments she received raises a great deal of suspicion about Andersen's true motives. Andersen claims Decker admits that she was told staff would be assigned. But the obvious disparity between receiving assurances that staff members will be assigned and then not actually getting those assignments creates an inference of hostile intent. Finally, Decker states that Andersen refused to discuss the resolution of her claim arising out of the denial of partnership in 1992, and when Decker asked George Shaheen, Andersen's Chief Executive Officer, to get involved in resolving the matter, she was told to resign or be terminated.

These assertions support the inference that Decker's responsibilities were undercut and that she was ultimately terminated in response to her EEOC charge and August letters which informed Andersen that she planned to pursue her discrimination claim. The 1993 partnership offer could reasonably be interpreted as Andersen's attempt to minimize its damages in the event a lawsuit came to fruition. This is especially true when the offer is viewed in conjunction with the facts Decker cites; all of those facts support her argument that the 1993 partnership offer was not genuine. Andersen argues that Decker's August 1993 letters led the firm to believe that she had resigned. But "[w]hen this evidence is viewed in the light most favorable to [Decker], a reasonable fact finder could infer that [Andersen]'s reason for [the adverse action] is not worthy of credence." *Holland*, 883 F.2d at 1316.

As a final point, the court notes that Decker's retaliation claim, like her sex and pregnancy claim, hinges in large part on the credibility. of the witnesses. "Faced with complicated facts that can only emerge in full color from the testimony of a variety of witnesses with varying interests and motivations, [this court] cannot say, on the basis of this cold record, that as a matter of law [Decker] has no fair chance of prevailing at trial." *Veatch v. Northwestern Memorial Hosp.*, 730 F.Supp. 809, 820 (N.D.Ill.1990). Because dismissal at this stage would be premature, Andersen's motion for summary judgment on Decker's retaliation claim is denied.

### C. *Count 3—Breach of Contract*

The question of whether a contract exists is one of law for a judge to decide. *Wojcik v. Commonwealth Mortgage Corp.*, 732 F.Supp. 940, 941 (N.D.Ill.1990). For an oral contract to exist, the parties must have had a meeting of the minds with respect to the terms of the agreement and must have intended to be bound by the oral agreement. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991). "[T]he focus under Illinois law is on the conduct of the parties and whether that conduct objectively manifested assent to an agreement." *Baker v. Elmwood Distributing, Inc.*, 940 F.2d 1013, 1017 (7th Cir.1991); *see also Midland Hotel Corp. v. Reuben H.*

**1308**

*Donnelley Corp.*, 118 Ill.2d 306, 515 N.E.2d 61, 65, 113 Ill.Dec. 252, 256 (1987). Consequently, a party's "subjective belief is not a consideration in the *Duldulao* analysis. The inquiry is, conversely, whether a reasonable person could have understood that a contract was formed." *Boll v. Hyatt Corp.*, 243 Ill. App.3d 1005, 1009, 614 N.E.2d 71, 74, 184 Ill.Dec. 870, 873 (1st Dist.1993).

A reasonable person could have understood that a contract was formed between Taylor and Decker. In exchange for Decker's working the 80/20 format, Taylor said that chargeability would not be an issue in her partnership evaluations and that he would inform the other partners of "this commitment." Even if Decker knew those partners would be involved in reviewing her candidacy, the latter of Taylor's statements would certainly enable a reasonable person to conclude that "this commitment" was intended to be a binding agreement.

Andersen claims that Taylor's statements are not clear and definite enough to constitute a promise. Even if that were so, "the task of disambiguating ambiguous utterances is for trial, not summary judgment. On a motion for summary judgment, the ambiguities in a witness's testimony must be resolved against the moving party." *Shager*, 913 F.2d at 402. A promise is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts, sec. 2(1) (1981). Taylor's express statements that Decker's chargeability "would not be an issue" and that he would inform the other persons reviewing her candidacy of "this commitment" are sufficiently clear to support the existence of a promise.

■ Andersen further contends that even if a promise exists, consideration is lacking because Decker's basis for consideration rests only on the fact that she continued working at Andersen and increased her nonchargeable ILS work. However, Decker states in her affidavit that Fischer said he would support her for partnership in 1992 if she transferred to TS. Decker relinquished this opportunity by remaining assigned to CMS. Furthermore, even if Fischer made

no such promise, Decker's continued work for Andersen is sufficient consideration on its own. For promises unrelated to the duration of employment, "the employee's continued work constitutes consideration for the promises." *Duldulao v. St. Mary of Nazareth Hosp. Center*, 115 Ill.2d 482, 490, 505 N.E.2d 314, 318, 106 Ill.Dec. 8, 12 (1987). "Certainly, one can extract from *Duldulao* a rule of law that an employee's continued work is sufficient consideration for employment promises to form a valid contract under traditional contract principles." *Piech v. Arthur Andersen & Co., S.C.*, 841 F.Supp. 825, 830 (N.D.Ill.1994).

■ Finally, Andersen argues that no breach occurred because chargeability was not the reason Decker was denied partnership in 1992. As discussed *supra*, a jury could reasonably infer that Andersen's alternative reasons for Decker's partnership denial are not worthy of credence. Moreover, Decker's affidavit states that several partners informed her that chargeability *was* the reason. Indeed, Fischer's deposition testimony supports her allegation. Fischer Dep., Exhibit F, at 49, 57. Finally, summary judgment must be denied if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511. Whether chargeability was a factor in Decker's partnership denial is a question of fact that must be decided by a jury, not this court. Since a jury might resolve this issue in favor of either party, Andersen's motion is denied.

### D. *Count 4—Promissory Estoppel*

As her final claim, Decker avers that Taylor's statements regarding her chargeable hours give rise to an actionable claim based on promissory estoppel. Decker further alleges that she relied to her detriment on Taylor's statements by not transferring full-time to TS, which would have increased her chargeable hours and, based on Fischer's support, the likelihood that she would make partner in 1992.

Promissory estoppel may be invoked in both contractual and non-contractual settings. *Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1223 (7th Cir.1991); *Falk v. U.H.H. Home Servs. Corp.*, 835 F.Supp. 1078, 1079 (N.D.Ill.1993). To state a claim for promissory estoppel under Illinois law, a plaintiff must allege that (1) defendant made an unambiguous promise to plaintiff; (2) plaintiff relied on such promise; (3) plaintiff's reliance was expected and foreseeable by defendant; and (4) plaintiff relied on the promise to its detriment. *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 310, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990). "In order to allege an unambiguous promise for the purposes of a promissory estoppel claim, an express promise is not required." *Falk*, 835 F.Supp. at 1080. Such a promise "may be inferred from conduct and words" as well. *Id.*

In this case, the only element in dispute is whether Taylor's statements regarding Decker's chargeability constitute an unambiguous promise. As noted above, after assessing the record in a light most favorable to Decker, a jury could find that Taylor's statements constituted an unambiguous promise. Taylor is the managing partner of the Chicago office, which is Andersen's largest office. Decker's belief that he could speak on behalf of the partners reviewing her candidacy was reasonable, especially when that promise is viewed in conjunction with Taylor's two statements—that chargeability would not be an issue and that he would inform the other partners of this "commitment."

In *Falk*, the court concluded that it was reasonable that the plaintiff "might have inferred" a promise when the defendant's high-ranking executives made certain representations to her concerning a job opening. *Falk*, 835 F.Supp. at 1081. The court held that "[s]uch assurances surpass the requirements of Illinois promissory estoppel law which does not require an express promise." *Id.* Similarly, Decker could reasonably infer that Taylor's assurances were a promise. Thus, Andersen's motion must be denied.

1. By order dated February 18, 1994, this Court

*CONCLUSION*

Finally, this court notes that Decker's synopsis of the facts is either disputed in part or completely denied by Andersen. Resolution of these conflicting versions will hinge on the credibility of witnesses, and this court cannot determine issues of credibility on a motion for summary judgment. The court concludes that Decker's proffered evidence would enable a jury to infer that her pregnancy was the reason she was denied partnership. In addition, Decker has met her burden with regard to the retaliation, breach of contract and promissory estoppel claims. Therefore, Andersen's motion for summary judgment is denied.