2025 IL App (1st) 241270-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
August 4, 2025

No. 1-24-1270

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | |
|---|---|
| *In re* MARRIAGE OF | ) |
| | ) Appeal from the |
| JAMES KEHOE, | ) Circuit Court of |
| | ) Cook County |
| Petitioner-Appellant, | ) |
| | ) No. 22 D 8580 |
| and | ) |
| | ) The Honorable |
| LILIA GARAVAGLIA, | ) Renee Goldfarb, |
| | ) Judge Presiding. |
| Respondent-Appellee. | ) |

---

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirms the trial court's finding in favor of respondent that there was no meeting of the minds between parties who married in Italy to treat their mandatory selection of a "property regime" as a contract to govern disposition of assets upon divorce.

¶ 2    This appeal is of the trial court's denial of a motion for declaratory judgment filed by petitioner James Kehoe (James) in the context of dissolution of marriage proceedings between him and respondent Lilia Garavaglia (Lilia). The couple was married in Italy in 2000 but never resided there after the marriage. Pursuant to a requirement of Italian law, at the time of their marriage they

made a declaration in document titled "*Atto di Matrimonio*" (translated as "Act of Marriage")[1] that "they have chosen the regime of separation in their property relationships." In the dissolution proceedings, James sought a declaratory judgment that the couple's declaration in the *Atto di Matrimonio* was a valid and enforceable agreement under section 503(a)(4) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/503(a)(4) (West 2022)), pursuant to which "property excluded by valid agreement of the parties, including a premarital agreement or a postnuptial agreement" does not constitute "marital property." The trial court conducted an evidentiary hearing on the question of whether there was a meeting of the minds to treat this required declaration as a contractual agreement. At the conclusion of James' case in chief, the trial court granted a motion for a finding in favor of Lilia. James now appeals that ruling. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4                                          A. Introduction

¶ 5        On July 29, 2000, James and Lilia were married in Italy. Lilia is a citizen of Italy, and James is a citizen of Ireland. Prior to their marriage, they both resided in Italy and worked at Kraft Foods. In February 2000, James accepted a temporary reassignment to a position at Kraft Foods that required him to move to the United States. In April 2000, James relocated to Connecticut. Lilia joined him there a few days after their wedding. Since that time, the parties have resided in various places throughout the United States and other countries. They have never resided in Italy since the day of their wedding.

---

[1] For consistency, we refer to the document at issue by its title, "*Atto di Matrimonio*," throughout this decision. The parties and witnesses use differing terminology to refer to this document, with James generally referring to it as "the Italian Agreement" and Lilia referring to it as "the marriage certificate." Some witnesses also refer to it by its English translation, the "Act of Marriage."

¶ 6        Neither party disputes that Italian law requires all couples marrying in Italy to choose one of two matrimonial property regimes that will apply to their future financial affairs.[2] One such property regime is translated as "community of assets," which applies by default if no election is made. Generally, under that regime, all property acquired after the marriage by one or both spouses are owned equally, regardless of which party holds title to the property or funded the purchase. The other regime is translated as "separation of assets." Under that regime, each party's property remains his or her property after the marriage, and any property that is acquired after the marriage belongs solely to the party that acquired it. Selection of this latter regime requires a proactive election by the parties, and one of the ways by which they may do so is a signed declaration in their *Atto di Matrimonio*, which is registered with the appropriate office of vital records.

¶ 7        It is further undisputed that during their wedding, as part of signing their *Atto di Matrimonio*, James and Lilia made an election of the "separation of assets" property regime. As per the certified translation, the relevant portion of their *Atto di Matrimonio* states:

"SEPARATION OF PROPERTY. The bride and groom, in the presence of the witnesses mentioned above, in accordance with Article 162, second paragraph of the Civil Code, declare that they have chosen the regime of separation in their property relationships."

¶ 8                                B. Pleadings and Motion for Declaratory Judgment

¶ 9        In 2022, James filed the present action for dissolution of marriage in the circuit court of Cook County. On March 14, 2023, James filed an amended petition for dissolution of marriage. The amended petition included an allegation referencing the parties' above-described selection of the

---

[2] We note that the laws of a foreign country are not matters of which Illinois courts may take judicial notice, but rather they must be pleaded and proved as with any other fact. See *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 145; see also 735 ILCS 5/8-1007 (West 2024).

separation of assets property regime to control their future financial affairs. It further alleged that the court should enforce this agreement pursuant to section 503 of the Illinois Marriage and Dissolution of Marriage Act (*id.* § 503) or other applicable authority. Lilia filed a response to the amended petition, which in pertinent part denied that the above constituted any sort of binding, enforceable agreement between the parties with respect to the allocation of assets.

¶ 10        On May 12, 2023, James filed the motion for declaratory judgment that forms the basis of this appeal. Specifically, he argued that the parties' agreement to select the "separation of assets" property regime should be enforced to exclude each party's "separate" property from the marital estate pursuant to section 503(a)(4) of the Illinois Marriage and Dissolution of Marriage Act. *Id.* § 503(a)(4). Section 503(a)(4) excludes from the definition of "martial property" that "property excluded by valid agreement of the parties, including a premarital agreement or a postnuptial agreement." *Id.* He requested the court enter a declaratory judgment that the above-described agreement is a valid and enforceable agreement under section 503(a)(4) and general principles of contract law.

¶ 11        Lilia filed a response in opposition to James' motion for declaratory judgment. She argued that the *Atto di Matrimonio* was merely the parties' Italian marriage certificate and was not any form of a contract or agreement between them. It did not include the most basic aspects of an enforceable contract, including any provisions governing the parties' property rights upon divorce. It was also unenforceable in that it failed to comport with the requirements of the Illinois Uniform Premarital Agreement Act (750 ILCS 10/1 *et seq.* (West 2022)).

¶ 12        James filed a reply brief and concurrently requested an evidentiary hearing. James also attached an affidavit from Roberta Ceschini, an Italian lawyer who practices in the area of family law and specializes in international divorces. In pertinent part, Ceschini's affidavit explained the

legal process of property regime selection by a couple marrying in Italy. It further stated that the property regime selection in the *Atto di Matrimonio* is a contract and valid agreement under Italian law. It is different from a marriage certificate, which is an extract of the *Atto di Matrimonio* containing information that the parties were married on a particular date. James further argued in his reply brief that even if the parties' agreement is viewed as a premarital agreement within the meaning of the Illinois Uniform Premarital Agreement Act, it satisfies the two requirements for validity of being in writing and signed by both parties. See *id.* § 3.

¶ 13    The trial court ultimately granted James' request for an evidentiary hearing. In doing so, the court stated that it needed parol evidence to determine whether there had been a meeting of the minds as to the terms of a contract when James and Lilia signed the *Atto di Matrimonio* and selected a property regime.

¶ 14                                C. Evidentiary Hearing

¶ 15                                *1. Testimony by James*

¶ 16    James was the first witness to testify at the evidentiary hearing. He began his testimony by identifying the parties' *Atto di Matrimonio* and explaining his understanding at time of the wedding of the two Italian property regimes. By that time, he had been living in Italy seven years and was fluent in Italian. He and Lilia became engaged in December 1999. Asked how he and Lilia came to decide on the separation of assets regime, he testified that Lilia had raised the issue and that there were multiple factors involved. He wanted it because of the protection of his financial assets. As to his expectation of whether it would be enforceable if they moved outside of Italy, he testified that he believed it would be enforceable because the parties "had every intention of changing countries." In particular, they were moving to the United States on a temporary visa and their destination was uncertain, so he was relying upon the formalities of the Italian Civil Code for his

long-term protection. He testified that he knew he was going to be moving to the United States in December 1999 when they decided to become engaged. Lilia was aware of his job in the United States and was intimately involved in the offer process. He and Lilia had to meet with the parish priest in preparation for the wedding, and property regimes were also discussed in that meeting.

¶ 17 James testified that he and Lilia met and started dating in 1993, around the time he first moved to Italy. Lilia was 32 at the time of the wedding, and she had always lived in Italy. Lilia wanted to get married in Italy, and she wanted to be married before they moved. During their engagement prior to the wedding, James and Lilia had discussions about the separation of assets regime. The first conversations started around the time they became engaged, when Lilia explained the separation of assets regime, the implications for choosing it, and the fact that she preferred it. James also preferred it. James testified that Lilia expressed her preference for choosing the separation of assets regime because first, "everybody in Milan is doing it," and second, "everybody's assets are kept separate." James testified that he also talked to his Italian friends and to several of his family members about selecting between the property regimes.

¶ 18 James testified that prior to the wedding, he personally decided on the separation of assets regime because he wanted protection for his assets. He had considerably more assets than Lilia. He also wanted to appease family concerns that he have a prenuptial agreement. He explained to his family that the separation of assets regime was "essentially like a prenup," because prenuptial agreements do not exist in Italy. He was relying on this regime to protect his assets in the event of a divorce, and he explained this fact to his parents. He also testified that he believed Lilia had been unfaithful to him in the past, and that weighed on his decision to select separation of assets.

¶ 19 James testified that from 1993 until their wedding, he gained a general knowledge of Lilia's financial condition. He had an intimate knowledge of her employment, because she worked in

finance at Kraft Foods where he worked also. She was earning approximately $100,000, as of the time they were married, and she obtained an equivalent role with Kraft Foods when they moved to the United States. She had her own bank accounts. James testified also that he shared information about his own financial condition with Lilia leading up to the wedding. This included extensive information including bank account records, compensation records, and the value of the apartment that he had purchased in 1999 in Milan. Lilia was very organized and filed all of his financial records except for his taxes. She was also aware that he owned an apartment in Ireland. She was aware of his compensation because she filed his paychecks away. James testified as to various financial documents to demonstrate Lilia's general knowledge as of the July 2000 timeframe about James' assets, financial condition, and obligations.

¶ 20   Since the parties' marriage, they have lived in the New York area; Chicago; Vienna, Austria; Zurich, Switzerland; back to Chicago; Montreal, Canada; back to Chicago; Tokyo, Japan; and then they came finally back to Chicago in 2018. At the time he was married, James could not have known what country he would ever be divorced in. James testified that he would have moved back to Italy.

¶ 21   On cross-examination, James acknowledged that there are instances when the official translation of the "*Atto di Matrimonio*" translates that phrase as "marriage certificate." He was questioned extensively that some of the other documents he had discussed were contracts that contained explicit terms and conditions, and he agreed that there was not a separate document beyond the *Atto di Matrimonio* itself that set forth any terms and conditions of the agreement it purported to be. James testified that he and Lilia discussed the possibility of returning to live in Italy, but he was then impeached with his deposition testimony in which he stated he did not recall. He testified that when he signed the *Atto di Matrimonio*, he was not thinking about what would

happen if he got divorced in another country. He did not research whether the *Atto di Matrimonio* would have any legal effect if he got divorced in another country. He testified that he presumed that any divorce would be in Italy, but he was then impeached with a deposition statement in which he said, "I presumed that it would be regulated under Italian law because I wasn't a citizen of other countries." He acknowledged that he was aware at the time of his marriage that premarital agreements existed in other countries, including Ireland and the United States. He did not speak to a United States-based attorney or any other person in the United States about premarital agreements. He also never talked to any attorney in Italy about premarital agreements. He and Lilia never talked about what would happen if they got divorced in another country, and he never gave that any consideration before he signed the *Atto di Matrimonio*. They never moved back to Italy following their marriage.

¶ 22                                    *2. Testimony by Lilia*

¶ 23        The second witness to testify at the evidentiary hearing was Lilia, who was called as an adverse witness in James' case-in-chief. At the time of their wedding, Lilia was 32 and James was 37. She had worked at Kraft Foods in Italy for approximately eight years. She grew up in Italy and had attended approximately 10 to 20 weddings in Italy before hers. Her sister had been recently married, and Lilia had been present at her wedding when she selected the separation of assets property regime. Lilia agreed that, on their wedding day, she made the voluntary decision to select the separation of assets property regime. At that time, it was common in Milan for marrying couples to select that regime. She considered it an easy choice. She explained that the benefit to her of selecting it was that "between the two, [it] was the less complicated since I was leaving Italy at that time." She wanted the benefit of not needing to obtain James' signature when she wanted to close her bank accounts.

¶ 24    During her engagement, she did no research as to how the election of the separation of assets regime would affect her going forward in her marriage, beyond her general knowledge. She did not consult any lawyer about it. She knew by at least February 2000 that she would be moving to the United States after the wedding. She did not do any investigation about whether the separation of assets regime would apply to a divorce proceeding in the United States or any other country they might live in. She believed that the agreement to select separation of assets would apply only in Italy. She never discussed with James her belief as to how it would apply outside Italy. She understood that choosing the separation of assets regime requires a proactive choice, and it cannot be imposed on an unwilling spouse. She knew that Italy did not allow premarital agreements at the time of her marriage; she also knew that selecting between the two property regimes was their only option in Italy at that time.

¶ 25    Lilia was also asked questions going to her knowledge of James' assets, financial condition, and obligations at the time the parties signed the *Atto di Matrimonio*. She was generally aware of his income and financial affairs. She was involved in his purchase of the apartment in Milan. She knew he earned more money than she did because he was in a higher position at Kraft. She was involved in the creation or maintaining of certain spreadsheets that listed James' assets.

¶ 26    On questioning by her own counsel, Lilia testified that the reason she did not consult with a lawyer about the selection of property regime was because she was leaving Italy immediately after her marriage. She also testified that she and James never had any discussions prior to their marriage about entering into a prenuptial agreement.

¶ 27                    *3. Testimony by James' Siblings*

¶ 28    The third witness to testify was James' brother Henry Kehoe. He was a guest at the parties' wedding. He testified that the night before James' wedding, James was acting "out of control" and

his state of mind appeared to be that he was questioning the wedding. On cross-examination, Henry testified that Lilia never spoke English in front of him, so he never overhead any discussions between Lilia and James about signing a premarital agreement. He testified that he believed James and Lilia were signing a prenuptial agreement because James told his family that they were.

¶ 29    The fourth witness to testify was James' sister Sandra Kehoe. She was one of the witnesses to the marriage and signed the *Atto di Matrimonio*. She does not read Italian and could not understand the document, other than that it was a wedding register and she was witnessing the signatures. She testified that at a party two nights before the wedding, James was quite upset and told her that the reason for this state of mind was that Lilia had an affair and he was questioning the marriage.

¶ 30                    *4. Testimony by Italian Attorney Roberta Ceschini*

¶ 31    The final witness to testify in James' case-in-chief was his expert witness Roberta Ceschini. She testified that she is an attorney in Italy with a practice specializing in international family law, particularly divorces in which one of the spouses is not Italian. She explained that under Italian law, there are two property regimes, and it is mandatory for a marrying couple to choose one of the two. A property regime is a way in which the spouses agree to arrange for ownership of property acquired during the marriage and how to divide it upon dissolution or death of one of the spouses. Under the "separation of assets" regime, no marital property is formed during the marriage, and each spouse maintains sole ownership of all assets acquired during the marriage. Under the "community of assets" regime, any assets acquired during the marriage are pooled as marital property, with certain exceptions. There are multiple points in time at which a couple can select a property regime, one being by writing in the *Atto di Matrimonio* which regime is being

selected. That is what occurred in this case, and James and Lilia agreed upon the "separation of assets" regime.

¶ 32    Ceschini testified that property regime selection is an integral part of the marriage contract in an Italian marriage pursuant to article 159 of the Italian Civil Code. That article provides that the "community of assets" regime applies if no selection occurs. In her opinion, a couple's property regime selection is an agreement between the spouses under Italian law.

¶ 33    She testified that the separation of assets regime is the option most commonly selected in Italy because it is easier in the sense that, upon dissolution of marriage, there is no dispute about marital assets and how they are to be divided; however, couples who choose this regime are still allowed also to hold property in common if they wish to do so. She testified that in Italy, premarital agreements may only address the selection of marital regime and the choice of law, but addressing spousal support or child support is forbidden.

¶ 34    A second affidavit by Ceschini was introduced into evidence during her testimony, with the exception of one stricken paragraph. In that affidavit, she addressed the opinions proffered by Lilia's proposed expert witness. She disagreed with an opinion expressed by Lilia's expert that the separation of assets regime would apply only if the whole of Italian matrimonial law applied in the dissolution proceedings. Ceschini stated that the scope of marital regimes was more limited than the scope of the whole Italian matrimonial law, because choosing a marital regime means that the spouses have made a choice whether they want the property acquired during the marriage to be common or separate. Certified translations of article 162 and 215 of the Italian Civil Code were admitted into evidence at the conclusion of Ceschini's direct examination.

¶ 35    On cross-examination, Ceschini was first asked about article 215, which as translated states, "The spouses can agree that each shall retain sole ownership of property acquired during the

marriage." She acknowledged that article 215 makes no reference to divorce. She also agreed that it is impermissible under Italian law to make a premarital agreement that addresses the consequences of divorce.

¶ 36    Ceschini was also questioned about the choice of law analysis that would be undertaken by an Italian court in the hypothetical event that the parties' divorce had been filed there. She agreed that Italy allows couples to make agreements as to the choice of law to apply in the event of divorce, and James and Lilia did not do that. She also testified that under Italy's choice of law rules, an Italian court would not have jurisdiction over this divorce in the hypothetical event that it had been filed there because jurisdiction is based entirely on the residence of the spouses, and neither spouse was a resident of Italy. An Italian court would not have jurisdiction over this divorce on the basis of Lilia's Italian citizenship or because the marriage occurred there years ago at a time when the parties were residents.

¶ 37                          D. Trial Court's Finding in Favor of Lilia

¶ 38    At the conclusion of James' case in chief, the trial court granted an oral motion by Lilia for a finding in her favor. See 735 ILCS 5/2-1110 (West 2024). The trial court issued a written order summarizing the basis for its ruling. The trial court found the testimony of Lilia to be "far more credible than that of James" and "supports the finding that there was no meeting of the minds whatsoever, let alone that they were making an agreement about their property in the event of a divorce that would be a premarital agreement enforceable outside of Italy" when they signed the *Atto di Matrimonio*. The trial court's order briefly recapped the parties' testimony that it found pertinent. As to Lilia, it cited her testimony that choosing separation of assets would require only one signature when she needed to close a bank account; that she never talked to a lawyer about the regimes; that she assumed the selection of separation of assets regime would only apply in Italy;

that she and James were planning to move to the United States immediately after the wedding; and that she knew premarital agreements were not allowed in Italy and therefore never discussed with James the possibility of entering into one.

¶ 39    As to James, the trial court cited his testimony that he did no research as to whether the selection of a property regime in the *Atto di Matrimonio* would have any legal effect if he divorced in another country. It cited his testimony that he knew that Italy did not allow premarital agreements at the time of the parties' marriage, but that other countries, including Ireland and the United States, did allow them. The court referenced his testimony that he believed any divorce would occur in Italy and that he and Lilia had discussed the possibility of returning there. However, the trial court noted that he was impeached with his deposition testimony that he did not recall discussing the topic of ever returning to live in Italy. The court also noted that James was impeached with a statement in his deposition in which he stated that he presumed the parties' agreement would be regulated by Italian law "because I wasn't a citizen of other countries." The trial court noted that he was not a citizen of Italy and was in fact a citizen of Ireland at the time of the marriage.

¶ 40    The trial court's order also referenced Ceschini's testimony that Italian law allowed James and Lilia to make agreements as to the choice of law to apply in a divorce, but they did not do so. The trial court also referenced her testimony that the parties' divorce was not one over which an Italian court would have had jurisdiction, due to the parties' residence predominantly in the United States since the time of their marriage. Accordingly, the trial court entered a finding in favor of Lilia and denied James' motion for declaratory judgment. It thereafter made an express written finding that no just reason existed for delaying the enforcement or appeal of its order. See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). James then filed a timely notice of appeal.

¶ 41                                    II. ANALYSIS

¶ 42     On appeal, James argues that the trial court erred in granting Lilia's motion for a finding in her favor on James' motion for declaratory judgment at the close of his case-in-chief. He makes two principal arguments. First, he contends that the trial court fundamentally misapprehended the argument he was making that the parties' selection of the separation of assets property regime was a valid and enforceable premarital agreement under Illinois law. Second, he argues that the trial court failed to weigh the totality of the evidence in its consideration of Lilia's motion and omitted any discussion or analysis of the bulk of relevant evidence favorable to his case.

¶ 43     This appeal is before us upon the granting of a motion under section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2024)), which provides that in all cases tried without a jury, a defendant may, at the close of the plaintiff's case, move for a finding or judgment in his or her favor. In ruling on such a motion, a court engages in a two-prong analysis. First, the court must determine, as a matter of law, whether the plaintiff has presented a *prima facie* case, which a plaintiff does by proffering at least some evidence on every element essential to the plaintiff's underlying cause of action. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). If the plaintiff fails to meet this burden, the court should grant the motion and enter judgment in the defendant's favor. *Id.* Because the determination that a plaintiff has failed to present a *prima facie* case is a question of law, the appellate court applies *de novo* review under this first prong of the analysis. *Id.*

¶ 44     If the trial court determines that the plaintiff has presented a *prima facie* case, it proceeds to the second prong of the inquiry. *Id.* There, in its role as the finder of fact, the trial court must consider the totality of the evidence presented, including any evidence that is favorable to the defendant. *Id.* at 275-76. Unlike the standard that governs a motion for directed verdict in a jury

trial, a court considering a motion under section 2-1110 does not view the evidence in the light most favorable to the plaintiff. *Id.* at 276. Rather, the court must weigh all the evidence, determine the credibility of the witnesses, and draw reasonable inferences therefrom. *Id.* This weighing process may result in the negation of some of the evidence presented by the plaintiff. *Id.* After weighing the quality of all of the evidence, both that presented by the plaintiff and that presented by the defendant, the court should determine, applying the standard of proof required for the underlying cause, whether sufficient evidence remains to establish the plaintiff's *prima facie* case. *Id.* If the trial court finds that sufficient evidence has been presented to establish the plaintiff's *prima facie* case, the court should deny the defendant's motion and proceed with the trial. *Id.* If, however, the court determines that the evidence warrants a finding in favor of the defendant, it should grant the defendant's motion and enter a judgment dismissing the action. *Id.* The appellate court will not reverse the trial court's ruling under this second prong unless it is contrary to the manifest weight of the evidence. *Id.*

¶ 45        Preliminarily, the parties disagree as to the standard of review that we should apply in this appeal. They agree that the trial court decided Lilia's motion under the second prong of the above analysis under section 2-1110. Nevertheless, James urges this court to review the trial court's ruling *de novo* instead of evaluating whether its finding in favor of Lilia is against the manifest weight of the evidence. Relying upon *Atkins v. Robbins, Salomon & Patt, Ltd.*, 2018 IL App (1st) 161961, ¶¶ 56-57, James argues that that the trial court below merely "observed" the evidence and did not evaluate or weigh it. He argues that in *Atkins*, this court applied *de novo* review in a similar situation where the trial court had merely "observed" evidence but did not weigh it. See *id.* ¶ 56.

¶ 46        We reject James' argument, and we conclude that manifest weight is the proper standard of review. We find James' reliance upon *Atkins* to be inapposite. In *Atkins*, the reason that this court

found *de novo* review to be appropriate was because we determined that the trial court's ruling was actually based upon a matter of law (*i.e.*, whether lost profits were recoverable in a legal malpractice case by a medical corporation that was itself not profitable, but whose sole shareholder was a highly compensated officer and employee) instead of being based upon a weighing of evidence (*i.e.*, that the medical corporation's evidence failed to show a reasonable basis for calculating lost profits). *Id.* ¶ 57. In this case, by contrast, the trial court's ruling on Lilia's motion did not turn on a matter of law. Instead, its ruling involved a consideration of whether the evidence presented by James had sufficiently established that, by selecting the separation of assets property regime as required by Italian law, James and Lilia were intending to contract on the matter of how property acquired during their marriage would be treated in the event of a divorce. The existence of a contract, its terms, and the intent of the parties to form a contract are questions of fact. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 19. In order for a contract to exist between two parties, there must be a meeting of the minds or mutual assent as to the terms of that contract. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313 (1987). However, it is not necessary that they share the same subjective understanding as to the contract's terms, and it suffices if their conduct indicates an agreement to the terms of an alleged contract. *Id.* at 313-14. Whether there has been a meeting of the minds or mutual assent to the terms of a purported contract is also a question of fact. *Arbogast*, 2021 IL App (1st) 210526, ¶ 20.

¶ 47        We find it clear from our review of its written order that the trial court evaluated the evidence presented by both parties and made credibility determinations about whether there was a meeting of the minds between James and Lilia to enter into a contract that would govern their property rights upon divorce. Accordingly, our standard of review is whether the trial court's finding is

against the manifest weight of the evidence. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 48    On the merits, James' first principal argument is that the trial court's analysis was manifestly erroneous because it misapprehended his argument; and this error then permeated its analysis and caused it to view the matter "through an incorrect and distorted lens." This argument by James is based upon a sentence in the first paragraph of the trial court's written order, wherein it framed James' argument to be that that the parties' selection of the separation of assets regime was an enforceable contract in Italy and thus also "is enforceable in Illinois *despite* the Illinois Uniform Premarital Agreement Act (750 ILCS 10/1 *et seq.* [(West 2024)])." (Emphasis added.)

¶ 49    James contends that he made the opposite argument, which was that the parties' agreement to hold their assets separately was valid and enforceable *pursuant to* the Illinois Uniform Premarital Agreement Act. As we understand it, his argument is that under section 3 of the Illinois Uniform Premarital Agreement Act (*id.* § 3), a *prima facie* showing of a valid premarital agreement requires only that "[a] premarital agreement must be in writing and signed by both parties." James emphasizes that he focused his evidence and arguments during the evidentiary hearing on showing that he had established these two formalities. Thus, he contends, because he made a *prima facie* showing of a valid premarital agreement, the trial court should have shifted the burden to Lilia to establish one of the statutory grounds of invalidity, such as that she did not execute the premarital agreement voluntarily or that it was unconscionable and she lacked adequate knowledge of James' property and financial obligations. See *id.* § 7. James contends that none of Lilia's evidence negated his *prima facie* showing as to the agreement's validity under section 3.

¶ 50        We have reviewed the full transcript of the evidentiary hearing and the trial court's written order, and we find no indication from our review that its ruling was the product of a flawed analysis or a misunderstanding of James' argument. Instead, it is evident that the trial court's initial focus involved the more basic question of whether there was a meeting of the minds between the parties to treat their selection of a property regime as a contractual agreement at all, given that they were required by Italian law to select a regime in order to be married in Italy but that they did not intend to reside in that country after their marriage. See *Midland Hotel Corp.*, 118 Ill. 2d at 313 ("[i]n order for there to be a contract between parties there must be a meeting of the minds or mutual assent as to the terms of the contract"). In our view, James' argument above attempts to skip this important first step of establishing whether the parties intended to enter into a contract at all. This preliminary fact had to be sufficiently established before the trial court could address whether the purported premarital agreement satisfied the formalities of section 3 or whether Lilia had the burden of showing its unenforceability under section 7. Accordingly, we find that the trial court employed a proper analytical framework.

¶ 51        James's second principal argument on appeal is that the trial court, in making its finding in Lilia's favor, failed to weigh the totality of the evidence and omitted any discussion or analysis of the bulk of relevant evidence favorable to his case. This is a highly fact-intensive argument. To place his argument in context, we reiterate that the trial court's finding was mainly that Lilia was more credible in her testimony than James about the parties' intent at the time they declared their selection of the separation of assets property regime in their *Atto di Matrimonio*. The trial court found that Lilia's credible testimony supported the conclusion "that there was no meeting of the minds whatsoever, let alone that they were making an agreement about their property in the event of a divorce that would be a premarital agreement enforceable outside of Italy." The trial court

also stated that it was "perfectly obvious" to it that "neither party ever considered that the choice on the *Atto di Matrimonio* would have any effect on divorce, let alone outside of Italy."

¶ 52       James argues that this finding by the trial court ignored key testimony by Lilia, by James himself on direct examination, by his siblings, and by Ceschini. Starting with Lilia, James argues that the trial court overlooked her testimony about the benefits that she perceived for herself under the separation of assets property regime. Specifically, she "could operate on [her] own" without having to involve James in all property transactions. James contends that this testimony by Lilia contradicts the notion that she regarded this selection as a perfunctory choice without legal gravity. James also asserts that the trial court overlooked Lilia's testimony that she and James came to a "mutual understanding" when they selected the separation of assets regime and that she recognized it required a "proactive choice" and could not be imposed by default. James contends that this testimony by Lilia directly counters the trial court's finding that Lilia was credible in her testimony that she did not discuss the selection of a property regime with James or that there was no meeting of the minds whatsoever. (While James also asserts in his appellate brief that Lilia testified that she was aware that if the parties divorced, their assets would remain separate due to their selection of this regime, we do not find such testimony by her on the pages cited by James.)

¶ 53       With respect to his own testimony, James contends that the trial court overlooked his testimony that he and Lilia decided together to choose the separation of assets regime. They did so after multiple in-person discussions wherein Lilia, as a native Italian, explained the two regimes to him and expressed her preference for separation of assets. James also contends that the trial court overlooked his testimony that he wanted the separation of assets regime because he was not convinced the marriage would last due to Lilia's past unfaithfulness, and he asserts that this testimony was corroborated by that of his siblings. Finally, he argues that the trial court overlooked

his testimony that he "relied upon the formalities of the Italian Civil Code" for the long-term protection of his assets, since he knew that he was moving to the United States temporarily and that his place of residence in the long term was uncertain. James also faults the trial court for focusing only upon two isolated answers that he gave on cross-examination, concerning his belief that any divorce would occur in Italy and that he and Lilia had discussed returning to Italy to live. He contends that the trial court improperly found his deposition testimony to be impeaching when, in context, it was not materially inconsistent with his testimony at the evidentiary hearing.

¶ 54    Finally, James contends that the trial court ignored Ceschini's testimony when it stated that the agreement which James asserted that he and Lilia had reached did not include terms defining separation in their property relations or assets, how it would operate, or any reference to divorce or dissolution at all. James contends that Ceschini's testimony about Italian law supplied all of this information and made clear that the selection of a property regime was a contractual agreement under Italian law. James again faults the trial court for referencing only isolated testimony by Ceschini on cross-examination that (1) Italian law would have allowed James and Lilia to make a choice of law agreement that Italian law would apply in a divorce, but they did not do this, and (2) the courts of Italy would not have accepted jurisdiction over this divorce, due to the parties' residence predominantly in the United States since their marriage. James contends that the trial court presented this testimony by Ceschini without placing her statements in context and that they are substantively irrelevant to the question of whether the *Atto di Matrimonio* is a valid and enforceable agreement pursuant to the Illinois Uniform Premarital Agreement Act. James adds that the trial court appears to have disregarded Ceschini's testimony that Italy's statutorily mandated property regime selection serves a purpose that parallels private premarital agreements,

and he emphasizes that the validity of the parties' selection of regime does not depend on whether they consulted with an attorney.

¶ 55      We reject James' arguments that the trial court overlooked the above evidence in granting Lilia's motion for a finding in her favor under section 2-1110. Instead, we find that the trial court's ruling reflects a proper weighing of all of the evidence adduced by both parties and the making of determinations as to credibility. We further find that the evidence fully supports the trial court's finding that there was no meeting of the minds by these parties to treat their selection of the separation of assets property regime under Italian law as a contract controlling the disposition of their property upon divorce even if they did not remain residents of Italy. James presented minimal objective evidence that the parties intended to treat this as an important contractual decision. He did not testify to any conversation between them in which they discussed the topic of divorce in connection with their selection of a property regime or came to a mutual understanding as to how it would apply. Neither party consulted an attorney, particularly to question whether the selection of a property regime would continue to have legal effect once the parties were no longer residents of Italy, given their intent to relocate (at least temporarily) to the United States within days of their wedding. They did not make a choice of law agreement for Italian law to apply in a divorce, even though this was apparently one of the few divorce-related topics about which couples in Italy may contract. Neither the declaration of the property regime in the *Atto di Matrimonio* nor any other document contains terms or conditions referencing the disposition of property upon divorce, and we reject the argument that Ceschini's testimony supplied these missing terms. Her testimony contained only surface reference to divorce and provided minimal explanation about how the Italian separation of assets regime affected the disposition of property in that context. Importantly,

her testimony also established that Italian courts would not even have had jurisdiction over these parties' dissolution proceedings.

¶ 56 In sum, we find that the trial court focused on appropriate facts and did not overlook relevant and credible evidence on the issue of contract formation. We agree with its observation that the evidence here leads to the conclusion "that neither party ever considered that the choice on the *Atto di Matrimonio* would have any effect on divorce, let alone outside of Italy." The trial court's determination that there was no meeting of the minds to treat their selection of an Italian property regime as a contact concerning the disposition of property upon divorce was supported by the evidence and was not against the manifest weight of the evidence. Accordingly, we affirm its granting of the motion for a finding in favor of Lilia and its denial of the declaratory judgment sought by James.

¶ 57                                                    III. CONCLUSION

¶ 58 For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 59 Affirmed.